304 So.2d 272

**O. C. BESTER, alias**

v.

**STATE.**

**6 Div. 767.**

Court of Criminal Appeals of Alabama.

Nov. 26, 1974.

———◆———

Richard V. Jordan, Bessemer, for appellant.

William J. Baxley, Atty. Gen., and Quentin Q. Brown, Jr., Asst. Atty. Gen., for the State.

HARRIS, Judge.

Bester was convicted of murder in the first degree and the jury fixed his punishment at life imprisonment in the penitentiary. He was represented at arraignment and trial by court-appointed counsel. He pleaded not guilty. He was furnished a free transcript and trial counsel was appointed to represent him on appeal.

This was a cold-blooded murder without any mitigating or extenuating circumstances. On October 12, 1973, appellant shot and killed the defenseless proprietor of a grocery store known as Bush's Grocery located at 633 Fourth Avenue, Southwest, in Bessemer, Alabama. Mr. James Frederick Bush was shot and instantly killed during a robbery with òne blast from a sawed-off twelve gauge shotgun using number six shot. There were two eye witnesses to this murder, Larry Shoemaker, an eleven-year-old boy, who was a customer in the store at the time of the killing, and a seventeen-year-old youth, Darryl Wayne Bush, a nephew of the deceased who was also employed at the store.

Larry Shoemaker testified that he went to Bush's Grocery in the afternoon of October 12, 1973, and went to the drink box and got a chocolate milk and a coke. He went to the counter and paid Mr. Bush and

started out the store. A man entered the store with a box in his hands and the man removed a shotgun from the box. The man told Mr. Bush to come from behind the counter and as he started out the man shot him one time. Larry saw Darryl Wayne Bush run around the knife case and the man told Darryl to come out and get the money. Darryl went to the cash register and got the money and put it in a brown bag. The man took the money and left the store. Larry made an in-court identification of appellant as the robber and killer.

Darryl testified that he was stock clerk for his uncle and also pumped gas; that on October 12, 1973, around 5:30 p.m., he was putting merchandise on the shelves when a man came into the store with a box in his hands. The man opened the box and took out a sawed-off shotgun and told his uncle to "get the money", or to "stick-em-up." He saw his uncle raise his hands and sort of laugh. We quote from the record:

"Q. Who raised his hands, sort of laughed?

"A. My Uncle Fred. Then he was moving out from behind the left counter and that man told him to get over to the right counter as you come in the door and then I moved back down by the counter and Uncle Fred moved back to the other side of the counter he was at and he leaned back on the counter and this man just sat (sic) there and looked at him for a minute and he shot, and when he shot I ran for the stock room and he moved over behind the right counter as you come in the door and he told me to come back and so I came back and walked in and went behind the counter. He told me to get the money and I asked him if he wanted all of it. He said yes and so I taken (sic) the dollar bills out and I was handing them to him and I reached under the counter to get a paper sack to put the change in and he took off running. And there's a little boy

that was standing by the counter. I told him to run and look what color car he was driving, and which way they (sic) went, and I went and called the operator to get an ambulance."

This witness "eye-balled" appellant for three or four minutes at close range (a few feet) in a well-lighted store. He was asked to look around the courtroom and see if he could identify the man who killed his uncle and he pointed to appellant and made a positive in-court identification. He was shown the shotgun that was admitted in evidence as State's Exhibit 6 without objection and he identified the gun used by appellant to kill his uncle and rob the store.

Subsequent to October 12, 1973, the police officer in charge of this investigation brought five photographs of suspects to Darryl to see if he could identify his uncle's killer. These photographs were stacked on top of each other and when Darryl got to the second photograph he told the officer that was the man. The officer asked him to look at the other photographs. He looked at the others and again picked up the second photograph and told the officer that this was him.

Sometime later Darryl accompanied the police officer to Indianapolis, Indiana, to an extradition hearing at the courthouse in that city. He testified as to what had transpired in the hearing in Indianapolis as follows:

"Well, when they come in they told us all to stand up, tell the truth, nothing but the truth, and so I didn't—they didn't ask me to identify him until I got on the stand and the Judge asked questions."

He identified the man in court as the killer. After the hearing in Indianapolis, appellant was returned to Alabama to stand trial for murder.

The Deputy Coroner of Jefferson County for the Bessemer Division was called to the scene of the homicide. He had served

as coroner for seven years and prior to that time he was a Deputy Sheriff for eight years. He examined the body of Mr. Bush and on external examination found a four-inch by three-and-a-half inch hole in the left lower abdomen, two and a half inches from the midline. He probed the wound and found wadding and shot or pellets in the abdomen. His opinion, without objection, was that death was caused by a shotgun blast.

A Deputy Sheriff of Jefferson County went to Bush's store on the day of the homicide at approximately 6:20 P.M. When he arrived the coroner was present and two of the victim's brothers. The body was identified to him by the brothers. He made photographs of the store building as well as the interior showing the body on the floor where he was gunned down. These photographs were admitted in evidence without objection.

The deputy made a search of the premises surrounding the store and found a spent shotgun shell. He picked it up and preserved it as evidence.

This officer initiated an intensive investigation as to the identity and address of the man responsible for this heinous crime. In the course of his investigation he learned that a red Volkswagen was the get-a-way car and that it was driven by Charles Edward Johnson. Upon questioning Johnson, the officer was informed that Johnson picked up appellant behind Bush's Grocery on October 12, 1973, at 5:30 P.M. and that he had a box in his possession which contained a sawed-off shotgun. He further learned from this interview that Johnson carried appellant to his mother's home where he was living at that time.

The officer procured a search warrant and went to appellant's mother's home at 212 South 30th Street, in Bessemer, with three other deputies. Appellant's mother was shown the search warrant and she admitted the officers. She carried them to appellant's bedroom and they found an un-spent shotgun shell between the mattress of the bed which the mother told them that appellant slept in. It was a twelve gauge shotgun shell. Under the rear porch they found a cardboard box containing a sawed-off twelve gauge shotgun and a metal box containing various items.

The sawed-off shotgun and the spent shell found outside Bush's Grocery were sent by registered mail to the F.B.I. laboratory in Washington, D. C. for examination and comparison to determine if the spent shell was fired from this particular shotgun. A report from the F.B.I. was sent to the Bessemer officers together with the shotgun and the spent shell. There was a stipulation between the prosecutor and defense counsel that this report was admissible in evidence without further proof:

"MR. REYNOLDS: Judge, I believe by agreement we can introduce the report. I'd like, if it please the court, a stipulation that if Mr. Clarence M. Kelley were (sic) present in court, and sworn as a witness, and testified he would testify that he is an agent for the F.B.I. and prepared this report and examined this shotgun, 12-gauge American Gun Company sawed-off shotgun, serial number 285475, submitted to him by Sgt. E. E. Robins, and one spent shell submitted to him by Sgt. E. E. Robins, and that in his opinion that this shotgun, the American Gun Company sawed-off shotgun, fired the shotgun shell case submitted by Sgt. Robins. And further, Your Honor, that there were no fingerprints developable from this gun or cartridge of this defendant, O. C. Bester.

"MR. JORDAN: That's stipulated, Your Honor."

Appellant's mother testified that her son was twenty-one years of age and had been living with her; that he lived with her continuously from May until September 5, 1973; that he left home about three weeks before the officers came and searched her

house and that she did not hear from him, or anything about him until someone told her that he had been returned to the State to stand trial for the murder of Mr. Bush. When he left home, he did not tell her he was going and did not carry all of his clothes with him. She further testified that she did not know if appellant was in the State of Alabama on October 12, 1973, as she had not seen or heard from him since September 5th.

Appellant did not testify and no evidence was offered in his behalf save and except his mother's testimony which tended to support an alibi.

The trial court charged the jury on murder in the first and second degrees and submitted to them three verdict forms for their consideration: (1) murder in the first degree, (2) murder in the second degree, and (3) not guilty. The court also charged the jury on the law as to an alibi in connection with the not guilty verdict.

Appellant's counsel did not file a brief in this case but did send this court a telegram stating there were no reversible errors in the record and that counsel had so advised appellant.

There was no motion to exclude the state's evidence; no motion for a new trial; no request for the affirmative charge, or any charges; no exceptions to the oral charge of the court, and no adverse rulings during the trial that have any merit. In this posture of the record, nothing is presented for review. Eady v. State, 48 Ala.App. 726, 267 So.2d 516; Grant v. State, 46 Ala.App. 232, 239 So.2d 903; Robinson v. State, 46 Ala.App. 684, 148 So.2d 583.

We have carefully searched the record for errors injuriously affecting the substantial rights of the accused and have found none.

Affirmed.

All the Judges concur.